DMP:DKK
F. #2017R01178

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 14 2021   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

CONSTRUCTURE
 TECHNOLOGIES, LLC,
MICHAEL CALABRIA,
JOSEPH KEEGAN and
CASEY SILVER,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. 21-368 (JS)
(T. 17, U.S.C., §§ 506(a)(1)(A),
1201(a)(1)(A), 1201(a)(2)(A) and
1204(a)(1); T. 18, U.S.C., §§
2319(b)(3), 2323(b)(1), 2323(b)(2) and
3551 et seq.; T. 21, U.S.C., § 853(p))

THE UNITED STATES ATTORNEY CHARGES:

## INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

I.   **The Defendants**

  1. The defendant CONSTRUCTURE TECHNOLOGIES, LLC ("CONSTRUCTURE") was a limited liability company located in Melville, New York. CONSTRUCTURE provided information technology services, helping install, manage and service various networks and other technology products for small and medium sized businesses.

  2. The defendant MICHAEL CALABRIA, a resident of Manorville, New York, was President of CONSTRUCTURE.

       3.      The defendant JOSEPH KEEGAN, a resident of North Bellmore, New York, was the Chief Technology Officer of CONSTRUCTURE.

       4.      The defendant CASEY SILVER, a resident of Ronkonkoma, New York, was a Project Manager at CONSTRUCTURE.

## II. The Scheme to Circumvent Copyright Protection Systems

       5.      Between 2011 and 2018, CONSTRUCTURE sold, installed and provided services for computer programs that were copyrighted and then sold by victim software companies ("Victim Software Companies"). Each of the computer programs was a copyrighted work protected under Title 17 of the United States Code.

       6.      Some of the aforementioned computer programs were designed so that they could not be activated until a user paid the company for a "license" to use that software. In purchasing a license, the user received a "key"—a string of letters, numbers and symbols—that, when entered into the copy of software obtained by the user, activated the software. CONSTRUCTURE's clients generally paid CONSTRUCTURE to purchase licenses for such computer programs and to activate those programs with a legitimate license key.

       7.      Starting in or about 2011, CALABRIA, KEEGAN and SILVER helped to operate CONSTRUCTURE's business in part by installing unlicensed versions of software from Victim Software Companies using "cracking" programs or "key generators," which allowed CONSTRUCTURE to activate copies of the software without paying for a license and obtaining a key. CONSTRUCTURE employees, often at the express direction of CALABRIA or KEEGAN, used cracking programs or key generators to install software

from multiple Victim Software Companies, including VMWare, a global cloud computing software company.

8. CONSTRUCTURE employees, including KEEGAN, obtained license keys and cracking programs from the Internet. They also tested those programs on a computer server located in the basement of CONSTRUCTURE's office in Melville, New York. The cracking programs and key generators were stored on CONSTRUCTURE's computer servers, including in subfolders labeled "/Cracks" and "/CTNY [CONSTRUCTURE Technology NY] Cracks."

9. Cracking programs used by CONSTRUCTURE employees were also stored on a file-sharing site controlled by CONSTRUCTURE so that the programs could be accessed and used remotely by CONSTRUCTURE employees.

10. By installing working, but unlicensed, versions of software, CONSTRUCTURE was able to bill a customer for the software under the pretense that CONSTRUCTURE purchased a copy or copies on behalf of the customer, while not actually paying for the copies of the software. In addition, CONSTRUCTURE was able to provide faster support to its clients by fixing problems using cracked software instead of purchased software.

11. CONSTRUCTURE employees, including CALABRIA, KEEGAN and SILVER, did not inform CONSTRUCTURE's clients or the Victim Software Companies whose computer programs were being cracked that CONSTRUCTURE employees used "cracks" to install those programs. At times, when a CONSTRUCTURE client or a Victim Software Company became aware of an unlicensed activation of a computer program or experienced operational problems, CALABRIA, KEEGAN and SILVER often either

installed or directed other CONSTRUCTURE employees to purchase and activate a license for that program.

      12.    CONSTRUCTURE employees communicated about the use of cracking programs and key generators to conduct CONSTRUCTURE business, including in the following emails:

    a.   On or about March 15, 2011, a CONSTRUCTURE employee wrote to CALABRIA and KEEGAN: "the trial [for a software program] expired [client] wants her license keys . . . should I do the same as last time and use our crack?" CALABRIA responded: "Yes."

    b.   On or about March 18, 2011, a CONSTRUCTURE employee wrote KEEGAN about the "[license] keys for [a client]" that were "failing." KEEGAN forwarded that email to CALABRIA, writing: "We need to get these sites legit. Let's not blow this customer by saving a few thousands [sic] $$ on pirated keys."

    c.   On or about October 31, 2013, SILVER emailed CALABRIA about a CONSTRUCTURE client: "We need to buy the license [for a Victim Software Company product], the crack no longer works."

    d.   On or about January 30, 2014, KEEGAN emailed another CONSTRUCTURE employee: "Can you see if you can rustle up a Keygen [key generator program] for [a Victim Software Company product]?" The employee replied: "It'll be up soon."

    e.   On or about September 15, 2014, SILVER wrote to CALABRIA about software licenses for a CONSTRUCTURE client: "Do we have a license for them, I have not been sent one? Should we use a crack?" CALABRIA responded: "crack."

 f. On or about November 26, 2014, KEEGAN emailed SILVER and another CONSTRUCTURE employee, writing: "For all VMWare projects recently rolled out, please let me know if we have received official licensing for VMWare software or not." SILVER responded by listing five clients and whether or not a "crack" had been used:
"[Client 1] – Cracked
[Client 2] – Official
[Client 3] – Official
[Client 4] – Cracked
[Client 5] – Cracked"

 g. On or about February 25, 2015, in response to an email from another CONSTRUCTURE employee about a license for a CONSTRUCTURE client, SILVER wrote: "Use the crack," and the employee responded: "Cracking now sir."

 h. In or about April 2016, a CONSTRUCTURE employee emailed KEEGAN: "For [Client's] local backup has been failing for over a month. [CONSTRUCTURE employee] has been primarily working on this, he is up to the point that he needs to call [a Victim Software Company] but [Client] is cracked and I was told not to contact [Victim Software Company] support if the client is cracked."

 i. In or about January 2017, a CONSTRUCTURE employee received an email from a representative of a software company that made backup software, about a copy of a software program that was not working. The representative wrote: "I have some bad news. This [serial] number is cracked/pirated serial." The email was forwarded to KEEGAN, who replied: "OK let's purchase the product for them they need it and it's inexpensive enough."

 j. On or about May 15, 2017, CALABRIA emailed KEEGAN and other CONSTRUCTURE employees about a CONSTRUCTURE client seeking software licenses: "[The client] wants to know what we can do as a work around until he has the budget for the upgrade next year." KEEGAN responded: "You know what we can do," referring to the use of a cracking program or key generator.

 k. On or about February 19, 2018, SILVER emailed another CONSTRUCTURE employee about certain software, including

        VMWare, for a client, writing: "I told you to order the licensing, we didn't, so ill [sic] just crack it."

13. During the time period in which CONSTRUCTURE employees installed cracked programs, the "Company Handbook" for CONSTRUCTURE employees stated:

> **Computer Software Licensing**
>
> The company purchases or licenses the use of various computer software programs. Neither the company nor any of the company's employees have the right to duplicate this computer software or its related documentation.
>
> The company does not condone the illegal duplication of software. You must use the software in accordance with the license agreement. This policy applies not only to individual desktop computers and laptops but to local area networks as well.
>
> Employees learning of any misuse of software or related documentation within the company shall notify a member of management. Employees who reproduce, acquire or use unauthorized copies of computer software will be subject to discipline, up to and including discharge.

14. From approximately 2011 to approximately 2018, CONSTRUCTURE employees installed cracked software programs for multiple clients, including clients located in Hicksville, New York; Mineola, New York; Manhattan, New York; and Bridgewater, New Jersey.

15. From approximately 2011 to approximately 2018, through the use of cracking programs and key generators, CONSTRUCTURE deprived the Victim Software Companies of at least $40,000 that CONSTRUCTURE otherwise would have paid to purchase license keys.

## COUNT ONE
(Violation of the Digital Millennium Copyright Act)

16. The allegations contained in paragraphs one through 15 are realleged and incorporated as if fully set forth in this paragraph.

17. In or about and between 2011 and 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CONSTRUCTURE TECHNOLOGIES, LLC did knowingly, willfully and for the purpose of commercial advantage and private financial gain, circumvent a technological measure that effectively controlled access to a work protected under Title 17 of the United States Code, and offer to the public, provide and otherwise traffic in a technology, product, service, device, component and part thereof, that was primarily designed and produced for the purpose of circumventing a technological measure that effectively controlled access to a work protected under Title 17 of the United States Code, to wit: false, fraudulent and illegally obtained license keys for accessing copyrighted software programs sold by the Victim Software Companies.

(Title 17, United States Code, Sections 1201(a)(1)(A), 1201(a)(2)(A) and 1204(a)(1); Title 18, United States Code, Sections 3551 et seq.)

## COUNT TWO
(Criminal Copyright Infringement)

18. The allegations contained in paragraphs one through 15 are realleged and incorporated as if fully set forth in this paragraph.

19. In or about and between 2011 and 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL CALABRIA, JOSEPH KEEGAN and CASEY SILVER, together with others,

did knowingly, willfully and for purposes of commercial advantage and private financial gain, infringe a copyright, to wit: copyrighted software programs sold by the Victim Software Companies.

(Title 17, United States Code, Section 506(a)(1)(A); Title 18, United States Code, Sections 2319(b)(3) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

20. The United States hereby gives notice to the defendants MICHAEL CALABRIA, JOSEPH KEEGAN and CASEY SILVER that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 2323(b)(1), of (a) any article, the making or trafficking of which is prohibited under Title 17, United States Code, Section 506; Title 18, United States Code, Sections 2318, 2319, 2319A, 2319B or 2320; or chapter 90 of Title 18 of the United States Code; (b) any property used, or intended to be used, in any manner or part to commit or facilitate the commission of such offense; and (c) any property constituting, or derived from, any proceeds obtained directly or indirectly as a result of such offense.

21. If any of the above-described forfeitable property, as a result of any act or omission of the defendants MICHAEL CALABRIA, JOSEPH KEEGAN and CASEY SILVER:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 2323(b)(2), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

    (Title 18, United States Code, Sections 2323(b)(1) and 2323(b)(2); Title 21, United States Code, Section 853(p))


                   _____
                    JACQUELYN M. KASULIS
                    ACTING UNITED STATES ATTORNEY
                    EASTERN DISTRICT OF NEW YORK

F.#: 2017R01178

FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

CONSTRUCTURE TECHNOLOGIES, LLC, MICHAEL CALABRIA, JOSEPH KEEGAN and CASEY SILVER,

Defendants.

# INFORMATION

(T. 17, U.S.C., §§ 506(a)(1)(A), 1201(a)(1)(A), 1201(a)(2)(A) and 1204(a)(1); T. 18, U.S.C., §§ 2319(b)(3), 2323(b)(1), 2323(b)(2) and 3551 *et seq.*; T. 21, U.S.C., § 853(p))

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day, of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

*David K. Kessler, Assistant U.S. Attorney (718) 254-7202*